**Timothy ROBERTS, Individually and as Next Friend of Melody Roberts, a Minor, Plaintiff,**

v.

**CARRIER CORP., et al., Defendants.**

**Civ. No. F 85–371.**

United States District Court,
N.D. Indiana,
Fort Wayne Division.

Sept. 25, 1985.

---

Russell L. Cook, Jr., Young, Cook & Hampton, Gilbert I. Low, Orgain, Bell & Tucker, Houston, Tex., for plaintiff.

Ben H. Sheppard, Jr., Vinson & Elkins, Houston, Tex., James P. Fenton, William F. McNagny, Barrett, Barrett & McNagny, Fort Wayne, Ind., for deponent Hamilton Standard Controls.

## ORDER

WILLIAM C. LEE, District Judge.

This matter is before the court on plaintiff's ("Roberts") Motion to Compel Discovery, and deponent Hamilton Standard Controls ("Hamilton") and defendant Carrier Corporation's ("Carrier") Motion to Quash and for a Protective Order. Roberts filed a memorandum in support of the motion to compel on August 16, 1985, and a memorandum in opposition to the motion to quash on September 10, 1985. On the issue of attorney-client and work product privileges, Roberts also filed a "Supplemental Brief Relating to Communications Between Carrier and Hamilton" on September 12, 1985. Hamilton and Carrier filed a memorandum in support of the motion to quash on September 6, 1985, and a reply brief on September 12, 1985. In addition, Hamilton and Carrier submitted fifty-seven documents for *in camera* inspection on September 6, 1985, a reply brief directed at Roberts' "Supplemental Brief" on September 16, 1985, and a "Statement of Facts" on September 23, 1985, which Roberts responded to by a letter to the court received September 23, 1985. An extensive hearing was held on the motions on September 6, 1985 as well as a telephone conference with counsel on September 19, 1985. In the course of the hearing and telephone conference, counsel indicated that substantial agreement had been reached on all but two items in the original discovery requests of Roberts, so that the court need only rule on the motions as they pertained to those two discovery requests. For the following reasons, the motion to compel and the motion to quash will be granted in part and denied in part, and the motion for a protective order will be considered moot.

This dispute arises out of an ancillary proceeding under Rule 37(a)(1) of the Fed-

eral Rules of Civil Procedure. That rule provides that an application for an order compelling discovery directed at a deponent who is not a party shall be made to the court in the district in which the deposition is being taken. Here, Roberts served upon Hamilton a request for the production of documents in connection with a deposition, and Hamilton has raised several objections to the materials sought in the request. Roberts moved this court to compel discovery, and Hamilton moved to quash and for a protective order. Carrier then joined with Hamilton in opposing the motion to compel. At the September 6, 1985 hearing, and the September 19, 1985 telephone conference, counsel indicated that an agreement had been reached concerning production of the requested materials, with the exception of two items listed in the request for production.

The underlying lawsuit, pending in the Eastern District of Texas, involves an action brought by Roberts for the injuries of Melody Roberts suffered in a house fire allegedly caused by a Carrier-manufactured furnace. Roberts seeks to discover information relating to the manufacture of the furnace and its component parts, especially a gas control valve, known as gas control valve # 242, as well as information concerning complaints and performance problems involving valve # 242. According to Roberts' motion to compel, the valve was manufactured by Essex Group, Inc. which, along with Carrier and Hamilton, is a wholly owned subsidiary of United Technologies, Inc. When Roberts sought information from Essex concerning the valve, Essex averred that the materials sought were in the possession of Hamilton, thus precipitating the present discovery controversy.

According to the assurances of the parties given to the court at the September 6 hearing and the September 19 telephone conference, all but two of Roberts' requests for documents served with the notice of deposition have been resolved, and a protective order has been drafted to cover the production. The two requests for documents still in dispute are items 5 and 9. Item 5 seeks the following:

5. Any communication with any governmental entity regarding Essex control valve # 242. This specifically includes any investigation by the Consumer Product Safety Commission. Any documents produced to that governmental entity, including the Consumer Product Safety Commission.

Item 9 seeks

[a]ll communications and/or agreements between Carrier Corporation and Hamilton Standard Controls, Inc. concerning this lawsuit, whether written or not.

Hamilton has objected to the item 5 request on the grounds that it has an absolute privilege against disclosure under the Consumer Product Safety Act for any information given to the Consumer Product Safety Commission, as well as a common law privilege against disclosure of "critical self-analysis." Hamilton and Carrier object to the item 9 request on the basis of attorney-client and work product privilege.

Rule 26(b) governs the scope of discovery requests. Rule 26(b)(1) provides that "[p]arties may obtain discovery regarding any matter, not privileged, which is relevant to the subject matter involved in the pending action...." Because Hamilton and Carrier have objected to the discovery requests on the basis of privileges, the court considers each privilege in turn in the context of the information sought by Roberts.

### Privilege under the Consumer Product Safety Act

Section 6 of the Consumer Product Safety Act ("Act"), 15 U.S.C. § 2055, regulates the disclosure of information by the Consumer Product Safety Commission ("CPSC"). That section establishes two main restrictions on the CPSC's ability to disseminate information under the Act. The first is a trade secret limitation. Under § 6(a)(2),

All information reported to or otherwise obtained by the Commission or its representative under this Act which information contains or relates to a trade secret

... shall be considered confidential and shall not be disclosed.

Subparagraphs (3)–(6) detail how the CPSC, prior to disclosure of any information which would permit the public to ascertain the identity of a manufacturer by the disclosure, must allow the manufacturer to mark the information as falling under § 6(a)(2) so as to bar disclosure.

The second restriction is set forth in § 6(b)(1), which requires that, prior to a disclosure to the public, a manufacturer shall be given a summary of the information to be disclosed and a reasonable opportunity to comment on the information. In § 6(b)(5), the Act then provides:

> In addition to the requirements of paragraph (1), the Commission shall not disclose to the public information submitted pursuant to section 2064(b) [15(b)] of this title respecting a consumer product unless—
>
>> (A) the Commission has issued a complaint under section 2064(c) [§ 15(c)] or (d) of this title alleging that such product presents a substantial product hazard;
>>
>> (B) in lieu of proceeding against such product under section 2064(c) or (d) of this title, the Commission has accepted in writing a remedial settlement agreement dealing with such product; or
>>
>> (C) the person who submitted the information under section 2064(b) of this title agrees to its public disclosure.
>
> The provisions of this paragraph shall not apply to the public disclosure of information with respect to a consumer product which is the subject of an action brought under section 2061 of this title, or which the Commission has reasonable cause to believe is in violation of section 2068(a) of this title, or information in the course of or concerning a judicial proceeding.

Hamilton argues that § 6(b)(5) gives it an absolute privilege against disclosure of information submitted to the CPSC in the course of civil discovery in an action brought against it by a private party. Hamilton argues from analogy to cases

such as *Baldrige v. Shapiro*, 455 U.S. 345, 102 S.Ct. 1103, 71 L.Ed.2d 199 (1982), involving release of information by the Census Bureau under the Census Act, and *Branch v. Phillips Petroleum Co.*, 638 F.2d 873 (5th Cir.1981), involving disclosure by the EEOC under Title VII, that the policy embodied in § 6(b)(5) prohibits disclosure in any context of information submitted to the CPSC.

■■■ The court is not persuaded that § 6(b)(5) works to prevent disclosure of information submitted to the CPSC in the context of civil discovery requests by a private litigant for several reasons. First, the very language of the statute only prohibits disclosure *by the CPSC*—the statute does not prohibit disclosure in general. Bound as it is to give words in a statute their common meaning, *International Administrators, Inc. v. Life Ins. Co. of North America*, 753 F.2d 1373, 1379 (7th Cir. 1985); *Ulane v. Eastern Airlines, Inc.*, 742 F.2d 1081, 1085 (7th Cir.1984), *cert. denied*, — U.S. ——, 105 S.Ct. 2023, 85 L.Ed.2d 304 (1985), this court reads a restriction directed only at the CPSC as restricting only the CPSC. Hamilton's interpretation of § 6(b)(5) is simply too broad. Nor does the case law cited by Hamilton alter this conclusion. *Baldrige* and *Branch* both involved attempts to force the federal agency involved to produce the documents. The statutes involved in those cases, as does the statute here, clearly prohibited disclosure by the agency. Those cases cannot be read as expanding the disclosure restrictions beyond the agency itself.

Second, the language of § 6(b)(5) itself suggests that the disclosure prohibitions do not apply in a civil discovery situation. Pared to its bare essentials, the last paragraph of § 6(b)(5) (conveniently not included in Hamilton's brief) states that "[t]he provisions of this paragraph shall not apply to the public disclosure of information ... in the course of or concerning a judicial proceeding." This language would make no sense if § 6(b)(5) provided an absolute privilege against disclosure in civil discovery as Hamilton claims it does. The

more plausible explanation of this language is that disclosure in a civil case will not be considered a violation of the section. Further, this language must extend to any type of judicial proceeding, and not just those brought by the CPSC, because the section specifically exempts certain proceedings brought by the CPSC. Congress could not have intended for the "judicial proceeding" language to be limited to actions brought by the CPSC, as such language would be useless in light of the specific exemptions set forth in the rest of the section.

Nor does Hamilton's citation to legislative history in its reply brief alter this conclusion. Hamilton points to the fact that language concerning disclosure in judicial proceedings, present in the Senate version of the Act, was removed from the final version of the Act. A close examination of legislative history quoted in the brief reveals that it relates to the trade secret provisions of § 6(a)(2), not the provisions of § 6(b)(5). Hamilton does not claim a privilege under § 6(a)(2) [1] (nor does it need to, as it can claim common law privileges of trade secrets to limit discovery), and thus this citation to legislative history is simply irrelevant. The language of § 6(b)(5) is clear that its provisions do not apply to prevent disclosure in a judicial proceeding.

Third, Hamilton's policy arguments fail to justify its reading of the statute. In its briefs, Hamilton argues that § 15(b) of the Act, 15 U.S.C. § 2064, mandates that manufacturers disclose information to the CPSC which indicates that a product fails to comply with a consumer safety rule or contains a defect which could create a substantial product hazard as defined by the Act. Hamilton claims that this section encourages frank disclosure by manufacturers, but that such disclosure would no longer occur if manufacturers knew that the information might become public. Hamilton reads § 15(b) as establishing a policy to encourage frank disclosure, and thus

§ 6(b)(5) must be read as protecting this disclosure. The issue of the common law privilege of self-critical analysis, directly implicated in this policy argument, will be discussed below. As for the Act itself, however, the court believes Hamilton's policy argument does not fit with the plain language of the statute. The disclosure of information is not discretionary under § 15(b); the Act requires a manufacturer to immediately inform the CPSC of information it has concerning a defective product. Thus the incentive (not to violate the law) is the same whether the information is discoverable or not. Further, the language of § 6(b)(5) concerning disclosure in a judicial proceeding indicates that Congress itself did not find the disincentive caused by disclosure through discovery to be as threatening to the functioning of the Act as Hamilton suggests it would be. The court is simply not persuaded by Hamilton's policy arguments under the terms of the Act.

Finally, the court is not convinced that the disclosure envisioned by the Act would occur in the context of civil discovery. Both § 6(a) and (b) speak of "public disclosure", although the language of § 6(a)(2) (which Hamilton does not seek to invoke here) appears to be more absolute in its prohibition. In the context of civil discovery subject to a properly drafted protective order, it is impossible to see how the information given to the CPSC would ever become "public", except in the derivative sense of being "facts" about the product presented at trial. In short, a protective order might well protect a manufacturer as much as the provisions of the Act. More important, however, a protective order would prevent the Act from coming into play precisely because of that protection from public disclosure.

The court therefore concludes that Hamilton cannot assert a privilege under the Act because the Act simply does not apply to a civil discovery request directed at a

---

**1.** Although Hamilton originally claimed that the information sought was privileged trade secret information, it dropped its objection after Roberts agreed to negotiate a protective order cover-

ing the use of the information. The court therefore concludes that any claim concerning trade secrets is moot, so that § 6(a)(2) is not implicated here.

manufacturer. However, Hamilton has asserted a common law privilege against the disclosure of critical self-analysis. Courts have recognized a privilege of critical self-analysis in certain situation. *See Jamison v. Store Broadcasting Co.*, 511 F.Supp. 1286, 1296–97 (E.D.Mich.1981); *Penk v. Oregon State Bd. of Higher Educ.*, 99 F.R.D. 506 (D.Ore.1982); *Resnick v. American Dental Ass'n*, 95 F.R.D. 372, 374 (N.D.Ill. 1982); *O'Connor v. Chrysler Corp.*, 86 F.R.D. 211 (D.Mass.1980); *Banks v. Lockheed-Georgia Co.*, 53 F.R.D. 283 (N.D.Ga. 1971). However,

> When [the privilege] has been adopted, the courts have consistently applied these standards:
>
> 1. To be privileged, the materials must have been prepared for mandatory government reports.
> 2. Any privilege extends only to subjective, evaluative materials.
> 3. It does not extend to objective data in the same reports.
> 4. Discovery has been denied only where the policy favoring exclusion has clearly outweighed plaintiff's need.

*Resnick*, 95 F.R.D. at 374. The court will therefore apply these criteria to Hamilton's assertion of a critical self-analysis privilege.

Although it appears at first blush that documents submitted to the CPSC under § 15(b) are submitted as parts of "mandatory government reports", the court interprets this first element as requiring that the document or material itself be prepared for report to the government. In *Resnick*, for example, the court declined to extend the privilege to a personnel study and the minutes of an employee relations committee of the American Dental Association because those documents were not themselves required by the government. As the court stated in *O'Connor v. Chrysler Corp.*, 86 F.R.D. at 218, the public policy behind the privilege is "to assure fairness to persons *required by law to engage in self-evaluation* ... and to make the self-evaluation process more effective by creating an effective incentive structure for candid and unconstrained self-evaluation." (Emphasis supplied). In short, the privilege protects only those evaluations that the law requires one to make. An evaluation made voluntarily, in a document not required by the government or not produced for the government, is not privileged.

The distinction here is critical, and is perhaps better explained by two examples drawn from the facts of this case. If Hamilton had produced documents in the regular course of its business which contained evaluations of the performance of valve # 242, then those documents would not be entitled to protection under the privilege because they were not produced for government required reports. The fact that they were later given to the government does not alter the fact that they were produced (in the sense of "generated") for some purpose other than reporting to the CPSC (for example, produced to assist design engineers in overcoming some defect in the design). If the privilege were allowed to prevent discovery of such documents, then any manufacturer could protect all of its internal documents from discovery in a products liability case by simply claiming that they were given to the CPSC. Such subterfuge would not only defeat the policies behind discovery, but would also provide a means for manufacturers to cover up critical evidence of their knowledge concerning defective products they may have produced. Clearly, the policy behind the privilege does not sanction such a powerful tool for defendants to cover up their own internal documents. However, if Hamilton were to make an admission concerning valve # 242 in a document prepared for submission to the CPSC (for example, in the cover letter to the CPSC accompanying the documents, Hamilton were to say "these documents indicate that valve # 242 has a high incidence of causing furnace explosions"), that self-evaluation would be privileged because the policy behind the privilege seeks to encourage such frankness in submissions to the government that are required by the government. Thus, this first element of the privilege, as

defined by the *Resnick* court, significantly limits the application of the privilege.

The only "government required reporting" that Hamilton can point to here is the requirement of § 15(b) of the Act which requires manufacturers to produce information to the CPSC concerning dangerous products. However, the privilege can only cover self-evaluations made *as part of the process of reporting to the CPSC.* Thus, documents not generated for the CPSC are not privileged, including internal documents of Hamilton. Further, the third element above indicates that the privilege does not extend to any objective data in the documents, including those documents generated specifically for the CPSC.

■ In short, the privilege will not protect much of what Hamilton has submitted to the CPSC. Given this limitation, Roberts' need for the data contained in those submissions will largely be satisfied by his ability to examine the documents and underlying objective data. Given the need to encourage frankness in evaluations submitted to the CPSC, however, the court does recognize that Hamilton is entitled to assert the privilege over that portion of the documents which was prepared for the CPSC and which contains self-critical analysis. The court will therefore grant the motion to compel, but deny it as to those parts of the documents prepared for submission to the CPSC which contain subjective self-critical analysis. Conversely, the motion to quash will be granted as to the above described self-critical analysis, but will be denied in all other respects as to item 5. Insofar as Hamilton seeks to withhold production of a document on the basis of the narrow privilege of critical self-analysis recognized here, the document should be submitted to this court for an *in camera* inspection and ruling on the applicability of the privilege.

## Attorney-Client and Work Product Privileges

In item 9 of his request for documents, Roberts seeks "[a]ny communications and/or agreements between Carrier Corporation and Hamilton Standard Controls, Inc. concerning this lawsuit...." Hamilton and Carrier have both objected to this request, citing attorney-client and work product privileges. Roberts argues that under Texas law (the law of the forum of the underlying lawsuit), Hamilton and Carrier cannot assert the privileges here. Hamilton and Carrier in turn interpret Texas law as allowing their privilege claims.

■ This aspect of the discovery dispute involves a claim of attorney-client privilege under Rule 26(b)(1).[2] It is settled law that "privilege" under Rule 26 means privilege as determined by the Federal Rules of Evidence. *United States v. Reynolds,* 345 U.S. 1, 6, 73 S.Ct. 528, 531, 97 L.Ed. 727 (1953); *Sirmans v. City of South Miami,* 86 F.R.D. 492, 494 (S.D.Fla. 1980). The specific rule of evidence which governs assertions of privilege is Fed.R. Evid. 501, which provides that the availability of a privilege in a diversity action is governed by the law of the forum state. *Somer v. Johnson,* 704 F.2d 1473, 1478 (11th Cir.1983); *Miller v. TransAmerican Press, Inc.,* 621 F.2d 721, 724 (5th Cir.1980), *cert. denied,* 450 U.S. 1041, 101 S.Ct. 1759, 68 L.Ed.2d 238 (1981); *Samuelson v. Susen,* 576 F.2d 546, 549 (3d Cir.1978); *Railrod Salvage of Conn., Inc. v. Japan Freight Consolidators (U.S.A.), Inc.,* 97 F.R.D. 37, 39 (E.D.N.Y.1983). The question is: the law of which forum state? The forum of the underlying lawsuit, or that of the state where the court making the discovery decision sits?

■ The Seventh Circuit has answered the question by selecting the law of the forum where the district court sits. In *Palmer v. Fisher,* 228 F.2d 603 (7th Cir. 1955), *cert. denied,* 351 U.S. 965, 76 S.Ct.

**2.** The work product privilege relates to materials prepared in anticipation of litigation, and is therefore governed by Rule 26(b)(3), not Rule 26(b)(1). The controlling law is federal, not state, and thus the analysis concerning state law privilege is limited to the attorney-client privilege.

1030, 100 L.Ed. 1485 (1956), a case not since overturned or modified on this issue,[3] a certified public accountant had been subpoenaed to appear for a deposition in Chicago, Illinois about an audit he had done on a business which was the subject of litigation in Florida. The accountant refused to produce certain documents requested in the subpoena, asserting an accountant's privilege which existed under Illinois law. The *Palmer* court stated:

> The next question is the applicability of an Illinois statutory privilege to a deposition taken in Illinois for use in Florida. We are unable to find direct authority on the point, but conclude that an Illinois court (or a federal court sitting in Illinois) could properly enforce this Illinois statutory privilege no matter where the deposition is to be used ... Questions of evidence, including privilege, are generally decided by the law of the forum ... Since the proceeding to suppress a deposition is an independent action, the law of the forum is the law of Illinois.

*Id.* at 608–09. More recent cases suggest this same conclusion. *See Samuelson v. Susen*, 576 F.2d at 549 (Rule 501 requires district court exercising diversity jurisdiction "to apply the law of privilege which would be applied by the courts of the state in which it sits"); *Wright v. Jeep Corp.*, 547 F.Supp. 871, 875 (E.D.Mich.1982) ("[b]ecause the defendant seeks to depose the respondent in Michigan, the appropriate law regarding privilege is the law of Michigan"). The court must therefore consult Indiana law concerning the attorney-client privilege.

▮ Indiana's recognition of the attorney-client privilege springs from somewhat unusual sources. The Civil Code of 1881, now codified at I.C. 34–1–14–5, provides that attorneys are incompetent witnesses "as to confidential communications made to them in the course of their professional business, and as to advice given in such cases." In addition, the 1881 Code defined one of the duties of an attorney as "[t]o maintain inviolate the confidence, and, at every peril to himself, to preserve the secrets of his client." I.C. 34–1–60–4. However, it is clear that "the rule is 'that when an attorney is consulted on business within the scope of his profession, the communications on the subject between him and his client should be treated as strictly confidential.'" *Colman v. Heidenreich*, 269 Ind. 419, 381 N.E.2d 866, 869 (1978), quoting *Jenkinson v. State*, 5 Blackf. 465, 466 (1840). *See also Thomas v. State*, 251 Ind. 546, 242 N.E.2d 919 (1969). What is essential to the existence of the privilege is a confidential relation of client and attorney, *Colman*, 381 N.E.2d at 869; *Harless v. Petty*, 98 Ind. 53, 57 (1884), and not the pendency of litigation, *Bigler v. Reyher*, 43 Ind. 112 (1873), or the payment of a fee. *Reed v. Smith*, 2 Ind. 160 (1850).

The factual situation here involves communications between Carrier and its attorney, and between Carrier's attorney and its insurer, which have been passed on to Hamilton.[4] Roberts argues that Carrier, who may have had a privilege as to communications with its lawyers and insurer, waived that privilege by passing on those communications to a third party (Hamilton).

▮ Indiana courts recognize that a client can waive the attorney-client privilege. *Brown v. State*, 448 N.E.2d 10 (Ind. 1983); *Key v. State*, 235 Ind. 172, 132 N.E.2d 143 (1956). Further, statements by a client to his attorney for communication to a third person is not considered confidential, *Bruce v. Osgood*, 113 Ind. 360, 14 N.E. 563 (1887); *Model Clothing House v. Hirsch*, 42 Ind.App. 270, 85 N.E. 719, 720

---

**3.** *Palmer* was subsequently overturned on the issue of the appealability of an order quashing a subpoena, *see Carter Products, Inc. v. Eversharp, Inc.*, 360 F.2d 868, 870–72 (7th Cir.1966), but has never been overturned or modified on the issue of which state law governs the assertion of privilege.

**4.** *See* Hamilton and Carrier's "Statement of Facts as to Plaintiff's Motion to Compel Production of Documents." In a letter to this court, Roberts' counsel stated that he would not oppose this statement of facts except for two items not directly relevant here.

(1908), and conversations between an attorney and a third party at the request of a client is not confidential. *Webster v. State,* 261 Ind. 309, 302 N.E.2d 763, 765 (1973). The issue here, one of first impression under Indiana law, is whether two companies can avoid this general rule governing communications to a third party by virtue of their relationship as sister subsidiaries of United Technologies.

Indiana cases setting forth the "third person" rule described above have generally involved third parties with clearly divergent interests from that of the client. In *Hirsch,* for example, the statements at issue were made by an employer to an employee's attorney for communication to the employee. In addition to the fact that the employer had no attorney-client relationship with the attorney, the fact that the communication was directed to a person who did not have interests harmonious with the employer indicates that the employer did not seek to keep his statements confidential. In *Webster,* the trial judge excluded testimony of the attorney of a criminal defendant's brother regarding conversations with the prosecutors about possible leniency for his client if his client would testify against the defendant. The Indiana Supreme Court ruled the testimony admissible because the conversation between the prosecutors and the attorney was a "third party" conversation. The prosecutors clearly did not share any interests with the client involved, a criminal defendant. *See also Lewis v. State,* 451 N.E.2d 50, 54–55 (Ind.1983) (police officer could testify as to substance of conversation he overheard between attorney and client); *Colt v. McConnell,* 116 Ind. 249, 19 N.E. 106 (1888), and *Hanlon v. Doherty,* 109 Ind. 37, 9 N.E. 782 (1887) (communication in presence of adverse party).

The relationship between fellow corporate subsidiaries, however, presents a much different situation. Corporations can claim an attorney-client privilege over their own communications with attorneys, *Newton v. Yates,* 170 Ind.App. 486, 353 N.E.2d 485, 491 (1976), and courts have extended the privilege to communications between a parent corporation and its attorneys which are also communicated to a subsidiary. *See Duplan Corp. v. Deering Milliken, Inc.,* 397 F.Supp. 1146, 1184–85 (D.S.C. 1974); *United States v. United Shoe Machinery Corp.,* 89 F.Supp. 357, 359 (D.Mass.1950); *Ins. Co. of North America v. Superior Court,* 108 Cal.App.3d 758, 166 Cal.Rptr. 880 (1980).[5] The language of these cases, however, suggests that the privilege can extend further. In *Duplan,* a corporate patent owner disclosed legal communications to its subsidiaries. The court stated:

> Although an interest of a third party corporation from a commercial standpoint would not establish a sufficient community of interest, the fact that the communications are among formally different corporate entities which are under common ownership or control leads this court to treat such inter-related-corporate communications in the same manner as intra-corporate communications.... Thus, if a corporation with a legal interest in an attorney-client communication relays it to another related corporation, the attorney-client privilege is not thereby waived.

397 F.Supp. at 1184–85. The third party corporation need not be a party to any anticipated or pending litigation;[6] it may share a community of interest (so as to keep communications privileged) if it shares an identical, and not merely similar,

---

**5.** Roberts attempts to distinguish this case on its facts and on the basis of California law's presumption of the existence of an attorney-client privilege. The court cites the case for its recognition of a claim of privilege in light of disclosure to a subsidiary; the factual manner of the disclosure, or the procedure of establishing the existence of the privilege in court, are irrelevant for this court's purposes.

**6.** If Hamilton was a defendant, its claim of privilege would be even stronger because of its "common defense" with Carrier. *See United States v. McParttin,* 595 F.2d 1321, 1336 (7th Cir.1979). However, the fact that Hamilton is not a defendant does not, as Roberts suggests, foreclose the claim of privilege.

legal interest as the client with respect to the subject matter of the communication between the client and its attorney. *Id.* at 1172.

■ The court finds that Carrier and Hamilton do share an identical legal interest: defense of a claim based upon a malfunction of valve # 242. While Hamilton is not a party to the Texas lawsuit, and thus technically is not defending a claim against it, it nevertheless has a significant interest in the outcome of Roberts' case, given that it is now responsible (within the United Technologies family) for valve # 242. The legal consequences of this case will have an impact on other present or potential litigation involving valve # 242, an impact to be directly felt by Hamilton. Thus, a concerted effort with Carrier is in Hamilton's immediate and long range interest. Within the confines of this case, the identity of interest arises out of the valve itself and the defense of the claim involving it. Thus, "inter-related-corporate communications", as the *Duplan* court describes them, between Hamilton and Carrier do not waive the attorney-client privilege that each enjoys in consulting with its attorneys because of their relationship via United Technologies and the identical legal interest shared in defending a claim involving valve # 242. The court concludes that the Indiana rule concerning communications to third persons is not violated here, and thus the documents are "privileged" so as to bar discovery of them.

Hamilton and Carrier's claims of a work product privilege are governed by Rule 26(b)(3), which states in pertinent part:

A party may obtain discovery of documents and tangible things otherwise discoverable under subdivision (b)(1) of this rule and prepared in anticipation of litigation or for trial by or for another party or by or for that other party's representative (including his attorney ... [or] insurer) only upon a showing that the party seeking discovery has substantial need of the materials in the preparation of his case and that he is unable without due hardship to obtain the sub-

stantial equivalent of the materials by other means. In ordering discovery of such materials ... the court shall protect against disclosure of the mental impressions, conclusions, opinions, or legal theories of an attorney or other representative of a party concerning the litigation.

Because Roberts specifically seeks communications between Carrier and Hamilton "concerning this lawsuit", it is clear that all such documents were "prepared in anticipation of ligitation." *See Binks Mfg. Co. v. National Presto Industries, Inc.,* 709 F.2d 1109, 1118–20 (7th Cir.1983). The fact that Carrier may have sent copies of documents to Hamilton does not constitute a waiver of the work product privilege because there is nothing to suggest that Carrier disclosed the documents with an eye towards allowing Roberts access to the information. *See United States v. American Telephone and Telegraph Co.,* 642 F.2d 1285, 1299 (D.C.Cir.1980); *In re LTV Securities Litigation,* 89 F.R.D. 595, 616 n. 14 (N.D.Tex.1981); *GAF v. Eastman Kodak Co.,* 85 F.R.D. 46, 52 (S.D.N.Y.1979); 8 Wright & Miller, *Federal Practice and Procedure,* § 2024 (1970).

■ To obtain discovery over materials that do not include opinions of attorneys, a party must, under Rule 26(b)(3), show "substantial need for the materials in the preparation of his case and that he is unable without undue hardship to obtain the substantial equivalent of the materials by other means." The standard for discovering materials containing attorney mental impressions and opinions is much higher. *See In re Murphy,* 560 F.2d 326, 336 (8th Cir.1977); *United States v. Willis,* 565 F.Supp. 1186, 1192 (S.D.Iowa 1983). Roberts has made no such showing in this case. At the hearing on the motion to compel, Roberts' attorney described the purpose behind his request as seeking to discover whether Carrier and Hamilton had some kind of agreement concerning the Texas lawsuit and what Carrier has asked Hamilton about valve # 242. (Tr.50). Such information is discoverable through written interrogatories, and the court's own *in camera* inspection of the doc-

uments submitted reveals that production of the documents would not supply Roberts with any answer to its question. The court concludes that Roberts has failed to make the requisite showing under Rule 26(b)(3) to overcome the work product privilege implicit in that rule, and thus the motion to compel the items requested in item 9 of Roberts' request for documents must be denied. Of course, this reason for denying the motion is independent of the court's determination on the attorney-client privilege.

The motion for a protective order is largely moot, as the parties have been negotiating a protective order to cover all materials produced, including those materials which the court would order production of in this order. Given these negotiations and assurances to the court that an order would be worked out, the motion for a protective order will be considered moot.

For the reasons stated above, plaintiff's Motion to Compel Discovery is hereby GRANTED as to all materials requested under item 5 not involving critical self-analysis in documents specifically prepared for submission to the Consumer Product Safety Commission, and is hereby DENIED as to critical self-analysis documents under item 5 and all materials under item 9. The deponent's Motion to Quash, as joined by defendant Carrier, is hereby GRANTED as to all documents requested in item 5 specifically prepared for submission to the Consumer Product Safety Commission which contain critical self-analysis, and all materials in item 9, and is DENIED with respect to all other documents requested in item 5. Any document which Hamilton seeks to withhold on the basis of critical self-analysis should be submitted to the court for an *in camera* inspection. The Motion for a Protective Order is hereby declared MOOT.